## Case No. 5,304.

### The GEM.

[1 Lowell, 180.] [1]

District Court D. Massachusetts.   Dec., 1867.

SHIPPING ARTICLES — DEFINITENESS — CONSTRUC-
TION—DEVIATION—RIGHT OF SEAMAN TO
LEAVE VESSEL—SUBSTITUTE.

1. Whether shipping articles which describe the voyage to be from the port of Salem, Mass., to Goree and a market and back to a final port of discharge in the United States, are sufficiently definite in the absence of evidence of usage to put some further limit to the voyage, quaere?

2. How far usage could be invoked in aid of shipping articles, quaere?

3. If such articles are valid, it must be by confining the voyage to Goree and neighboring ports, or ports usually visited in the same trade.

4. Limiting it thus, and holding the articles to be valid, they refer only to a market for selling the outward and procuring a homeward cargo, and do not authorize an intermediate trading voyage among the islands and on the coast of Africa.

5. When a seaman, shipped under such articles, has served until the outward cargo is disposed of, and a new intermediate trading voyage has been undertaken, and has well-grounded apprehensions of danger to his health, he may leave the vessel at a port where a substitute can be procured, without forfeiting the wages already earned; because there is a deviation, and one which, so far as he is concerned, is a substantial one.

In admiralty.

W. J. Forsaith, for libellant.
G. Wheatland, for claimant.

LOWELL, District Judge. Antonio Joseph brings his libel for wages against the bark; and it is admitted that he shipped at Salem as ordinary seaman on a voyage to the coast of Africa, and was with the vessel for six months and twenty days; that while well, he was faithful and obedient; that he was ill for some three weeks; and that he left the vessel at Brava, one of the Cape de Verd islands. The questions at issue are, whether the wages agreed on were twenty dollars a month or twenty-five dollars; whether his leaving the vessel was justifiable, and if not, what penalty he should suffer in reduction or loss of wages, partial or total.

This man, who says he is able to write, was shipped under a false name and signed with his mark, at the request, as he says, of the shipping master, and it seems that all or most of the crew were shipped by names that they never were known by since, and probably not before. Hence the confusion as to the rate of wages. The libellant says he appears as Smith on the shipping articles, while the owner shows another name as that which libellant is understood to have used. For whatever reason this mode of shipment was adopted, it is to be reprehended; and if there were any doubt of this man's identity, and the doubt were caused

1 [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

by the action of the shipping master, I should hold the owner to the higher rate; but the evidence is clear that the libellant could have had but twenty dollars, because that is the only price given to ordinary seamen by these articles, and the advance that he received of twenty-three dollars (not twenty-five as he was inclined to say) is explained by its including three dollars which he was to pay the shipping master.

Coming to the other point: it seems that the libellant was ill of a fever for a considerable time, and was nervous and dispirited; that he was afraid to go back to the coast of Africa, where his illness had been contracted, and, the master having refused to discharge him, he left the vessel, with no intention of returning, and his place was filled by the shipment of another man. This is not such a desertion as would authorize me to forfeit all his wages. There is no evidence that any entry was made in the log-book, and no statute desertion is set up. It is a peculiar case, and one that might require careful scrutiny to see how far the act was reasonable, and to what extent the owners had suffered by it. But upon another ground, I am of opinion that the master could not hold the libellant to further service.

The voyage described in the articles is, "From the port of Salem, Mass., to Goree and a market, and back to a final port of discharge in the United States." The vessel went to Goree and several ports on the west coast of Africa, in what order does not appear, disposed of her outward cargo, took passengers to one of the Cape de Verd islands, went to a second island for provisions, and was about to proceed to a third for a cargo of salt, with which to return again to the coast, and by trade or barter obtain a homeward cargo. At the second of these islands the libellant left the vessel.

Was there a sufficient description of the voyage in the articles, and if so, had there been a deviation? The articles must set out in clear terms the voyage or voyages to be undertaken, or the term or terms of time to be occupied; and if this statute requisition is not followed, the seamen may leave the vessel at any port where no special inconvenience will thereby be caused to the owners. Wope v. Hemmenway [Case No. 18,042]; affirmed, Snow v. Wope [Id. 13,149]; The Crusader [Id. 3,456]. In construing the articles, we are aided by analogous cases in the law of insurance. From New York to Barbadoes and a market, and thence to New York, construed by the light of a usage of trade, was held to mean to any island in the West Indies, until a market was found for the outward cargo; though it was doubted whether this construction would be given to a policy in any other trade. Maxwell v. Robinson, 1 Johns. 333. In two cases in Massachusetts, the market was limited in terms to Jamaica in one, and to the West Indies in

another. Houston v. Northeastern Ins. Co., 5 Pick. 89; Deblois v. Ocean Ins. Co., 16 Pick. 303. If the general words, "Goree and a market," are to be limited by construction, how, and to what extent, are they to be limited? Where shall the court find the limit? There was some slight evidence, but not enough to show a general course of trade, that voyages to the west coast of Africa are commonly·voyages of trade and barter along the coast and among the islands; both coast and islands were visited in this case. I confess I find great difficulty in construing these articles, independently of usage, as describing a voyage or voyages as fully and clearly as the seamen are entitled to have them defined. What is to prevent the master's going to Europe if he find no market in Africa or the islands?

The analogy of policies of insurance ceases here, because there is no rule of law avoiding policies which do not describe the voyage with clearness. Underwriters are supposed to be able to take care of themselves; they make such contract as they please; and a policy would not be held void for uncertainty, excepting as any other contract might be, which the court found itself wholly unable to construe. I am not aware that such a case has ever passed into judgment; but there are many where shipping articles have been so avoided. Again, if underwriters enter into an insurance agreement of indefinite duration, it may be a rule of law that they intend to contract for a reasonable time; and a question of fact whether such reasonable time had elapsed before the loss. The seaman is under the special protection of the statute law, and the duty is placed distinctly and solely upon the other party to the contract to see that it is properly expressed; and a reasonable time is not a term of time within the statute. If, therefore, this contract, independently of usage, means that the ship may seek a market anywhere, it is void, as not fixing the scope of the voyage with sufficient accuracy; or if the market means a number of markets, not only for the disposal of the outward cargo, but for indefinite intermediate trading, even within definite limits of space, it would be void for not fixing the limits of time.

But granting that the limits of this voyage can be fairly made out, by a consideration of the nature of the cargo, or otherwise, so as to comprehend only what is known as an African voyage; and that the market means a port or ports for the disposal of the outward and the procurement of a homeward cargo; then it would be a deviation to go on an intermediate voyage, such as the ship was prosecuting in this case. Her cargo had been sold, and if she could make a distinct voyage to get another cargo for trade on the coast, I see not why she could not make any number of such voyages. The ports she was bound to were not on the way to any port which was, or could be, a mar-

ket for outward or homeward cargo, but were visited for the express purpose of an independent trading transaction. This was a deviation; because, from the market, the voyage described in the articles is to a port of final discharge in the United States; and even if the market includes ports for receiving homeward cargo separate and distinct from the ports of delivery of the outward cargo, the voyage now being prosecuted was to neither. It was a substantial deviation, and a most material one; because the very objection of the libellant, whether well or ill founded, to a further prosecution of the enterprise was, that it would oblige him to return again to the coast of Africa, which, if the voyage described had been adhered to, would not have been the case.

I may sum up my views of this case by saying that, while the construction of all maritime contracts concerning voyages, and the obligations of the master in prosecuting them, are founded on the same general principles, the law is more stringent in relation to ships' articles than in any other case, and rests the burden of making a proper agreement upon only one party to it. On the other hand it may be a little less stringent in the matter of deviation. There may be deviations which would discharge underwriters or charge carriers, that would not relieve seamen from their engagement. Into this consideration, however, it is not necessary to enter, because the change here was an important and onerous one, in view of the libellant's state of health. Nor do I now consider when and how far usages of trade can be relied on to explain the shipping articles. Decree for the libellant.